UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-04-43-B-W-04 |
| | ) | |
| WILLIAM AHRENDT | ) | |

## ORDER ON RESENTENCING

At its May 11, 2010 resentencing of William Ahrendt on remand, the Court applied the policies underlying Amendment 709 of the United States Sentencing Guidelines to William Ahrendt's case and resentenced Mr. Ahrendt to a reduced term of incarceration of 162 months and an enhanced term of supervised release of 8 years.

## I.  STATEMENT OF FACTS

Sandra Hurd was a drug dealer.  While living in Massachusetts, Ms. Hurd sold powder and crack cocaine with Randy Brimley.  Ms. Hurd had Maine roots, and in November 2003, she was contemplating expanding her drug trafficking operation to Bangor, Maine. Through friends, she met William Ahrendt, a Bangor resident, and she made him a proposition: if Mr. Ahrendt would allow her drug dealing associates to sell cocaine out of his house at 124 York Street, she would give him money and cocaine.  She approached Mr. Ahrendt because he already had a built-in clientele.  Mr. Ahrendt agreed to the proposal and thus began a series of events that led ultimately to his trial, sentencing, and resentencing.

In 2003, Mr. Ahrendt was a forty-three year old man with a complicated past.  He was born in Oregon, Ohio.[1]  He never knew his father and while growing up he suffered some abuse by a stepfather.  He lived for a time in Ohio, moved to Florida, then to Minnesota, and relocated

---

[1] The Presentence Report says that he was born in Toledo; Mr. Ahrendt said at his sentencing hearing that he was actually born in Oregon, Ohio.

to Maine in August 2000.  He married three times and divorced twice; the last marriage was annulled.  He has four children.  Mr. Ahrendt attended college for a year and a quarter.

By 2003, Mr. Ahrendt had accumulated a criminal history.  In 1995, he was convicted in Minnesota of solicitation of children to engage in sexual conduct and was given a suspended sentence of one year and one day of incarceration plus three years probation.  He violated a condition of probation by having contact with juvenile females and his probation was revoked on April 9, 1998; he served the original prison term of one year and one day.[2]  While in Maine he was convicted on June 8, 2001 of three separate violations of protective orders, sentenced to nine months in jail, and placed on one year of probation.[3]

Mr. Ahrendt also had a psychiatric history.  He had been admitted four times to psychiatric hospitals, including admissions to Acadia Psychiatric Hospital and Bangor Mental Health Institute in Maine.  His diagnoses included mood disorder, psychosis, major depression with psychotic features, pedophilia, post traumatic stress disorder, and personality disorder with histrionic and narcissistic features.  Mr. Ahrendt had worked in the construction field, as an arborist, a warehouseman, and a flagger.  For the four years before his arrest, he had been receiving social security disability payments due to a mental disability.

Mr. Ahrendt has a highly abstracted world view.  During trial, he acknowledged having a "very, very different outlook in living," and he has developed a personal philosophy complete with its own unique terminology.  Among his personal convictions, Mr. Ahrendt firmly believes in being honest and not deceitful, and consistent with his beliefs, Mr. Ahrendt never denied taking drugs.  He has also indicated that if drugs were placed on the earth by the Almighty, he

---

[2] This is the charge and conviction in the Presentence Report.  At his original sentencing, Mr. Ahrendt said that he was convicted of sexual solicitation of a minor, spent forty-five days in prison, and was later found guilty of violating a condition of probation by taking a photograph of a foster mom with two teenage girls with packs of cigarettes in their hands.  He said he was sentenced to an additional sixty-two days.
[3] At his original sentencing, Mr. Ahrendt denied that he was ever in a courtroom on any of these three charges.

2

and others should be able to use them.  When evaluated at Federal Medical Center Devens in November 2004, Mr. Ahrendt described his "moral right to enjoy intoxicants."

In November, 2003, while living at 124 York Street, Mr. Ahrendt employed an open door policy.  A psychological report reveals that Mr. Ahrendt said he used marijuana "everyday if I am not working" and he acknowledged experimenting with a wide variety of other illegal drugs. He called his house the "Dog Pound," a place "where all strays are welcome;" his house attracted young people, and while there, they gained access to marijuana.  When Ms. Hurd first came to Mr. Ahrendt's York Street home in November 2003, it was crowded with young people and thus, as she stated, he had a "high clientele."

Ms. Hurd assigned Mr. Brimley the Bangor territory, and Mr. Brimley introduced her to his cousin, Kelvin Deloatch.  Ms. Hurd drove Mr. Deloatch to Bangor and introduced him to Mr. Ahrendt.  Mr. Brimley and Mr. Deloatch began to use Mr. Ahrendt's home as a base for introducing a new source of powder and crack cocaine to the Bangor area.  Not long after the operation began, Mr. Brimley and Mr. Deloatch cut Ms. Hurd out of the deal.

The Brimley-Deloatch cocaine trafficking operation was wildly successful.  Mr. Ahrendt's "high clientele" became immediately attracted to and addicted to cocaine.[4]  Sometime after New Year's Day in 2004, Mr. Ahrendt moved his home from 124 York Street to 17 Garland Street but remained in Bangor.  The business continued to grow and toward the end of the operation, Mr. Brimley and Mr. Deloatch recruited two associates from the Boston area: Clifton Davis and Chelsea Andrews.  Mr. Davis had just begun dealing cocaine in Bangor when the conspiracy unraveled.  Ms. Andrews was used by the Boston area drug dealers as cover.

---

[4] Cocaine was not, of course, unknown in the Bangor area before Ms. Hurd began to transport the drug from Boston. There were three aspects of this operation that were different: its scale, the relative youth of the clientele (mostly teenagers), and the number of drug-seeking young people.

The marked success of the operation drew the attention of local law enforcement.  In April 2004, Officer Robert Hutchings, Jr. of the Bangor Police Department set up surveillance on two different occasions, and he testified that during the entire time he observed Mr. Ahrendt's Garland Street house, there was constant vehicular and foot traffic in and out.  One vehicle would leave and another would pull up; someone would go to Mr. Ahrendt's home and leave shortly thereafter.  He said that the volume of traffic and the quick length of the visits were consistent with drug trafficking.

On April 19, 2004, Mr. Deloatch, Mr. Davis, and Ms. Andrews went to Mr. Brimley's house in Boston and picked up a load of cocaine to bring to Bangor.  They got on a Concord Trailways bus with the cocaine in their luggage, and as in the past, upon arriving in Bangor they were met by a local contact Theresa Mayhew.  Ms. Mayhew planned to drive them to Mr. Ahrendt's home to drop off Mr. Deloatch, Mr. Davis, and the drugs and take Ms. Andrews to a hotel.  However, shortly after Mr. Deloatch, Mr. Davis, and Ms. Andrews got into Ms. Mayhew's car and she began driving, the police stopped the vehicle pursuant to a search warrant and discovered cocaine in the luggage in the trunk.

On May 13, 2004, a federal grand jury indicted Mr. Davis, Mr. Deloatch, and Ms. Andrews on drug trafficking charges; on July 14, 2004, a grand jury issued a superseding indictment adding Mr. Ahrendt as a codefendant; and on May 11, 2005, a grand jury issued a second superseding indictment adding Mr. Brimley as a codefendant.  Mr. Davis, Mr. Deloatch, Ms. Andrews, and Mr. Brimley all pleaded guilty to drug trafficking charges.  They received the following sentences: Mr. Davis—60 months, Mr. Deloatch—144 months, Ms. Andrews—16 months, and Mr. Brimley—168 months.

Mr. Ahrendt did not plead guilty. Against the Court's earnest advice, Mr. Ahrendt exercised his right to represent himself and the Court appointed standby counsel. After a three-day jury trial from September 19 through September 21, 2005, Mr. Ahrendt was found guilty of engaging in a conspiracy to distribute and possess with the intent to distribute cocaine and engaging in a conspiracy to distribute and possess with the intent to distribute cocaine base. The jury found that the amount of cocaine attributable to Mr. Ahrendt equaled 500 grams or more and the amount of cocaine base attributable to him equaled 5 grams or more. On January 19, 2006, Mr. Ahrendt was sentenced to 210 months incarceration.

He appealed his conviction and sentence. On March 19, 2009, the First Circuit affirmed his conviction but remanded the case for resentencing in light of an amendment to the United States Sentencing Guidelines that had become effective while the case was on appeal. *United States v. Ahrendt*, 560 F.3d 69, 80 (1st Cir. 2009). After some delay caused by the need for updated competency evaluations, the Court resentenced Mr. Ahrendt on May 11, 2010. This Order explains the resentencing.

## II.    DISCUSSION

### A.    The First Circuit Opinion

On appeal to the First Circuit, Mr. Ahrendt challenged his conviction and his 210-month sentence. *Ahrendt*, 560 F.3d at 70. Mr. Ahrendt challenged the conviction on the ground that he was not competent and on the alternative ground that the Court erred in ruling that he could not present the testimony of Dr. Jeffrey Aston, a clinical psychologist who examined Mr. Ahrendt at his attorney's request. *Id.* at 74-76. The appeals court rejected both attacks. *Id.* The majority acknowledged that Mr. Ahrendt's competency had been raised and resolved periodically during his case and concluded that the record did not "reach the 'reasonable cause' threshold to require

a sua sponte hearing." *Id.* at 74.  The majority observed that Mr. Ahrendt "demonstrated an understanding of and participated in the proceedings" and concluded that "[i]n light of [his] demonstrated understanding and participation in the trial, neither his own communications alone, nor in combination with statements by counsel, constituted reasonable cause." *Id.* at 75.  Further, the majority noted that the Court had been presented "with evaluations from two mental health professionals, both of whom concluded that Ahrendt was competent to stand trial." *Id.*

Mr. Ahrendt also objected to the 210-month sentence on the ground that the Court erred in applying a leadership enhancement to his guideline calculation, that the disparity between his sentence and the sentences Mr. Brimley and Mr. Deloatch received was unwarranted, and that the criminal history calculation should incorporate changes in how criminal history points are scored that became effective during appeal.  A majority of the First Circuit panel rejected Mr. Ahrendt's leadership enhancement and disparity arguments.   However, in accordance with *United States v. Godin*, 522 F.3d 133 (1st Cir. 2008), the appeals court remanded the case to the trial court for resentencing on the proper calculation of Mr. Ahrendt's criminal history points.

Judge Merritt wrote a vigorous dissent on the sentencing issues.  He stated that he regarded "the 18-year sentence here for this nonviolent crime as unreasonably long and not sufficiently explained by the District Court." *Id.* at 80.  He did not agree with the imposition of the two-level leadership role enhancement, thought Mr. Ahrendt "obviously suffered from mental illness and remains on the borderline," and faulted the trial court for failing "to address the large disparity (12 and 14 years) between Ahrendt's sentence and the sentence of the real leaders and promoters of this group, co-conspirators Brimley and Deloatch." *Id.* at 80-81.[5]  On

---

[5] As noted earlier, Mr. Deloatch was sentenced to 144 months incarceration, Mr. Brimley to 168 months, and Mr. Ahrendt to 210 months.  The disparity between Mr. Ahrendt's sentence and Mr. Deloatch's and Mr. Brimley's respectively was actually 5 ½ and 3 ½, as Judge Merritt's dissent elsewhere acknowledged. *Ahrendt*, 560 F.3d at 81

the disparity issue, citing The Federalist, Judge Merritt observed that Mr. Ahrendt "has the right to trial by jury and should not be punished for exercising it."  *Id.* at 81, 81 n.9.

**B.    Competency**

**1.    Background**

From the outset of Mr. Ahrendt's case, the Court has been concerned about and struggled with the question of Mr. Ahrendt's competence.  Soon after Mr. Ahrendt was arrested, he began a hunger strike at the Penobscot County Jail and his court-appointed counsel immediately moved for a psychiatric examination, which was ordered.  Mr. Ahrendt spent from November 17, 2004 through December 17, 2004 at the Federal Medical Center Devens, in Ayer, Massachusetts.  Dr. Peter Schulz, a forensic psychologist at the Bureau of Prisons, issued a nine page report on December 29, 2004 and concluded that Mr. Ahrendt was suffering from a Personality Disorder, Not Otherwise Specified but was competent to stand trial.

The Court held a competency hearing on January 26, 2005 and neither Mr. Ahrendt's counsel nor Mr. Ahrendt himself, both of whom addressed the Court, objected to the psychologist's finding of competency.  Based on the December 29, 2004 competency evaluation and Mr. Ahrendt's lack of objection to its conclusions, the Court found he was competent to stand trial.

Beginning on April 25, 2005, Mr. Ahrendt began what has turned out to be a long series of correspondence to the Court, most of which reiterate his unique philosophy.  On June 28, 2005, Mr. Ahrendt's attorney filed a motion to withdraw, saying that his client had requested a hearing on his representation.  The Court held a hearing on the motion to withdraw on July 13,

---

(stating that "[n]either can I find a justification for the five and one-half and three and one-half year disparities between Ahrendt's sentence and the real leaders of the group").

2005, and after extensive discussion with defense counsel and Mr. Ahrendt, the Court denied the motion.

On August 8, 2005, Dr. Aston issued a report regarding Mr. Ahrendt's competency:

I first of all would not challenge the Bureau of Prison's finding that Mr. Ahrendt is capable of comprehending both the implications of his own behavior and the operations of a court of law; he appears technically competent and responsible in the narrow sense of the word.

More broadly, however, he is obviously given to a peculiar turn of mind which interprets everything in terms of a highly abstracted philosophy of life, a bit like some of the new-age college professors whose deconstructionist tomes are impossible for the uninitiated to comprehend. In Mr. Ahrendt's view, the world consists of persons who are motivated either by negative selfishness ("Lust") or positive altruism ("Love"). For him, drug use resembles an almost sacramental consumption of what the "Divine" Lovingly provides us, while society's war on drugs is a misguided Lust to control what others do. I think that his voluminous letters on the topic are quite sincere, while tellingly naïve. His years of absorption with chemicals blinds him to the fact that his current audience is hardly receptive to the message his letters untiringly reiterate. I have the impression that his letters provide him the only means of expression in a situation in which he now feels powerless. That they may be received more as annoying than persuasive is unimportant to him; he is not optimistic about his fate and his Message is all he has left to give.

He strikes me as more "dyssocial" than "antisocial" in character, in the sense that he does express a set of values, but these are deviant from the perspective of the larger culture.

Jury selection took place on September 8, 2005, and Mr. Ahrendt was represented by counsel. However, after jury selection, Mr. Ahrendt became determined to represent himself at trial. On September 14, 2005, the Court held another hearing on defense counsel's renewed request for leave to withdraw, and after extensive warnings and a lengthy discussion with Mr. Ahrendt, the Court allowed Mr. Ahrendt to represent himself at trial but appointed his court-appointed lawyer as standby counsel.

By electing self-representation, Mr. Ahrendt placed himself in a difficult position at trial, but he defended the case reasonably well. He gave an opening statement, cross-examined the

government witnesses, consulted with standby counsel, testified on his own behalf, and gave a closing argument. At one point, he objected to hearsay and the Court sustained his objection. True to his personal philosophy, Mr. Ahrendt did not deny using drugs or allowing the Boston group to use his house as a base of operations. He even admitted he was wrong to do so. But he denied being part of their conspiracy. During his Closing Argument, Mr. Ahrendt stated, "Again, I honestly was not part of their group, and hopefully you've seen this. I honestly have my own thing and my own way, and I share it with all. That is who I am." Even though the jury rejected his defense, Mr. Ahrendt's denial exploited the weakest part of the Government's case: whether the Government could prove that he was in fact part of the Boston drug dealers' broader conspiracy.

Following the First Circuit's remand, the Court ordered yet another psychiatric examination. On August 29, 2009, an independent psychologist in Florida performed a psychological evaluation of Mr. Ahrendt. Mr. Ahrendt refused to cooperate. He handed the psychologist a packet of handwritten notes that the psychologist later concluded were "illogical and rambling, consistent with both a formal thought disorder and delusional thought process." After telling the psychologist that "[e]veryone who is in custody by the United States Government is held by fraud," Mr. Ahrendt refused to respond to any questions. Based largely on the handwritten notes and his refusal to cooperate, the psychologist concluded that Mr. Ahrendt was incompetent.

As the Florida psychologist had not been able to interview Mr. Ahrendt, the Court ordered him to undergo a more thorough forensic evaluation through the Bureau of Prisons. Mr. Ahrendt was admitted to the Federal Medical Center at Butner, North Carolina on January 12, 2010, and the Butner report was completed on March 19, 2010. It recited his pre-indictment

history and completed his post-incarceration course.  The mental health professions issued a detailed seventeen page report and diagnosed Personality Disorder Not Otherwise Specified, noting that he has "traits of several personality disorders that do not meet criteria for any one personality disorder alone."  Although finding that Mr. Ahrendt exhibited traits of antisocial personality disorder, the authors did not think he was suffering from a mental illness, and they found no evidence to support the prior diagnoses of post traumatic stress disorder or mood disorders.  They acknowledged that Mr. Ahrendt believed he had been convicted falsely and imprisoned unjustly and he was very angry about it, but they concluded that his behavior had been volitional, not due to a mental illness or defect.  The mental health professionals at Butner concluded that he was currently competent to stand trial.

### 2.    Discussion

Assessing the competence of defendants who display some signs of mental instability is among the most difficult tasks the law gives a trial judge.  The question of whether Mr. Ahrendt was competent to stand trial has been resolved; the Court found he was and the First Circuit upheld this finding. *Ahrendt*, 560 F.3d at 74-75.

The issue on resentencing was whether he remained competent to be sentenced.  The First Circuit has held that "[t]he need for competency survives trial and extends through the sentencing phase of a criminal proceeding."  *United States v. Pellerito*, 878 F.2d 1535, 1544 (1st Cir. 1989).  A defendant must be able to participate in the adversary process, including "critical evaluation of the presentence investigation report [(PSR)] and allocution at time of sentencing."  *Id.* (citations omitted).  The sentencing process necessitates that the defendant possess "both a 'present ability to consult with [a] lawyer with a reasonable degree of rational understanding,'

and a 'rational as well as factual understanding of the proceedings.'" *Id.* (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)).

Mr. Ahrendt appeared before the Court on a number of occasions and represented himself throughout a three-day trial, so the Court was more familiar with him than with many defendants. Still, the evaluation of his competence was no easy matter. He had a history of psychiatric admission, and he had engaged in defiant conduct, such as hunger strikes, threats to kill himself, and long complicated letters to the Court and others. Reviewing his written work, it would be logical to conclude, as the Florida psychologist did, that Mr. Ahrendt was mentally ill and not competent.

But Mr. Ahrendt presented a much more complicated picture.[6] It began with his deeply-held belief that he has a right to take intoxicants. The Court has not questioned the sincerity of Mr. Ahrendt's beliefs, and he was not alone in his view that the Government should not regulate and police the availability of drugs, especially marijuana. What has made Mr. Ahrendt's case different is that most people who oppose drug laws realize that the laws against possession and distribution will be enforced unless and until the laws are changed and that by possessing and distributing illegal drugs they are subject to prosecution and incarceration. Mr. Ahrendt's belief in his inherent human right to ingest drugs has been so strong that he viewed any attempt to enforce the anti-drug laws as fundamentally unjust and mean-spirited, a worldview consistent with Dr. Aston's August 8, 2005 insightful description of Mr. Ahrendt's personal philosophy.

Once his premise—that the anti-drug laws in the United States are immoral—was understood, the rest of his conduct—his insistence that he was a hostage, that he was being

---

[6] At his competency hearing, Mr. Ahrendt explained that his view of drugs is more subtle than the Court has described. The Court acknowledged that no matter how it explained his views, it is unlikely to fully capture the details of his idiosyncratic philosophy. Mr. Ahrendt clarified that he believes people should be able to gain access to drugs, but he also believes the government should be responsible for distributing drugs to American citizens. Finally, Mr. Ahrendt affirmatively represented that he will not use intoxicants after he is released from incarceration.

persecuted, and that his defense lawyers, the prosecution, and the judge were acting unfairly—flows logically. The narrow question was whether Mr. Ahrendt's conviction that any judicial process that incarcerates him for possessing and distributing illegal drugs is inherently unjust rendered him incompetent to be sentenced.

On May 10, 2010, the Court concluded that he was competent within the *Dusky* standards: he had a present ability to consult with his lawyer with a reasonable degree of rational understanding and he had a rational as well as factual understanding of the proceedings. This conclusion was consistent with all the psychological reports, save the one where no interview took place.

First, as became apparent at the competency hearing, Mr. Ahrendt's views about intoxicants or at least his determination to use them have changed during his incarceration. Whether his change of philosophy will affect his sense of injustice and his defiant behavior remains to be seen. However, to the extent his oppositional attitude has been fueled by his philosophical leanings and to the extent the psychological diagnoses have been influenced by his defiance, his voluntary change of mind is an encouraging sign.

Second, the most convincing evidence of competence was Mr. Ahrendt's conduct during trial. Despite his beliefs, Mr. Ahrendt conducted his self-defense with self-control and insight, and he never acted inappropriately during the trial. He was respectful and cogent, and even though he wanted to urge the jury to conclude that criminalizing the possession and distribution of certain drugs was wrong, when the Court ruled that he could not tell the jury to ignore the law, he tailored his defense to the constraints of the law. Thus, the Court has believed all along that Mr. Ahrendt's conduct, in the words of the Butner report, has been "volitional and would not be due to a mental illness or defect."

12

It is true that at his original sentencing, he acted up.  He told the Court to let him "go home," that he objected "to the whole thing" when asked about objections to the Court's findings, and that he was "willing in a negative manner, to go ahead and disrespect you, too, sir, but as my positivity is, I'll just let you be."  But this was after he had been convicted and he was decidedly unhappy about being sentenced to a long term of incarceration for actions he believed were part of his basic human rights.  It was also no surprise that his oppositional pattern of behavior has continued intermittently during his incarceration, since Mr. Ahrendt has maintained that he has been unjustly convicted and incarcerated.

Even though the background of psychiatric admissions and treatment has been troubling, the Court found, as it did before, that Mr. Ahrendt was competent.  Mr. Ahrendt is a different kind of person and has held views, particularly about drugs, that are inconsistent with the law. But to tenaciously maintain iconoclastic and even eccentric views does not mean that a person is either mentally ill or incompetent.  Simply because Mr. Ahrendt's thinking has not conformed to mainstream standards, it does not follow that he lacked the present ability to consult with his lawyer with a reasonable degree of rational understanding or that he did not have a rational as well as a factual understanding of the proceedings.  Throughout the long course of his criminal case, including many courtroom encounters with Mr. Ahrendt, the Court has never concluded that he is incompetent, only, as Mr. Ahrendt himself has said, that he possesses a "very very different outlook in living."

## C.    The Mandate Rule

A preliminary question is the scope of discretion with the trial court upon remand.  The First Circuit remanded the case with the following directive:

> For the reasons explained above, we ***affirm*** Ahrendt's conviction but ***remand*** for resentencing in light of Amendment 709.

*Ahrendt*, 506 F.3d at 80.  On remand, Mr. Ahrendt attempted to reopen the question of whether he should receive a leadership enhancement under § 3B1.1(c).  *Def.'s Mem. Regarding the Resentencing of William Ahrendt* at 7-12 (Docket # 571).  The First Circuit had affirmed the application of the leadership enhancement at the original sentencing and had not remanded the case generally.  Accordingly, it seemed clear that the sentencing court could not revisit what had become law of the case.  This is especially true in the First Circuit, which unlike some other circuits, does not allow *de novo* resentencing on remand.  *United States v. Wallace*, 573 F.3d 82, 88 n.5 (1st Cir. 2009); *United States v. Cruzado-Laureano*, 527 F.3d 231, 234-35 (1st Cir. 2008); *United States v. Ticchiarelli*, 171 F.3d 24, 28-30 (1st Cir. 1999).[7]  The sentencing court "*may only consider* 'such new arguments or new facts as are made newly relevant by the court of appeals' decision—whether by the reasoning or by the result.'"  *Wallace*, 573 F.3d at 88 n.5 (quoting *Cruzado-Laueano*, 527 F.3d at 235) (emphasis in original).  On remand, the Court did not, as it could not, reconsider Mr. Ahrendt's leadership enhancement.

The precept that a guideline enhancement affirmed on appeal could not be reconsidered on remand was clear enough.  But the argument opened up a convoluted issue about the true scope of the sentencing court's discretion upon remand.  The problem arises between the guidelines and 18 U.S.C. § 3553(a).  Here, the First Circuit concluded that the trial court had correctly calculated the guideline sentence under the version of the guidelines that existed as of January, 2006.  However, because the computation of criminal history points under the guidelines had changed while the case was on appeal, the First Circuit, citing *Gall v. United*

---

[7] In fact, the seminal First Circuit case, *Ticchiarelli*, involved the application of the manager, supervisor, or leader enhancement under § 3B1.1 but in a slightly different context.  *Ticchiarelli*, 171 F.3d at 28-30.  The trial court originally sentenced a defendant as a manager or leader.  The defendant appealed the sentence, but not the court's determination that he was a manager or leader.  On remand, the sentencing judge refused to reopen the managerial role finding.  In *Tichiarelli*, the First Circuit addressed whether a defendant on remand could reopen an issue that had not been appealed, and generally concluded that he could not.  *Id.*

*States*, 552 U.S. 38 (2007), remanded the case to allow the trial court "to consider the Sentencing Commission's current thinking." *Ahrendt*, 560 F.3d at 79. The First Circuit did not, however, vacate the conviction and remand for sentencing, a distinction the First Circuit found significant in *Ticchiarelli*. 171 F.3d at 36 (stating that *"Pearce"*[8] involved starting anew after a conviction no longer existed; by contrast here the conviction stands and only the sentence was vacated in order that it could be corrected") (internal citation omitted).

The mandate did not order the Court to recalculate the guideline range, since the original range was done correctly, so the remand order must have contemplated that the Court would consider Amendment 709 within the context of its post-*Booker* discretionary authority under 18 U.S.C. § 3553(a). The next question, however, was whether the narrow remand—"resentencing in light of Amendment 709"—restricted the § 3553(a) analysis by the sentencing court to those factors directly relevant to criminal history. In this context, the statutory provisions would be § 3553(a)(1), the "history and characteristics of the defendant," and § 3553(a)(5)(A), the court shall consider "any pertinent policy statement issue issued by the Sentencing Commission." A limitation on the § 3553(a) factors the Court could consider would be consistent with the First Circuit's policy against *de novo* sentencing on remand and its restriction to "such new arguments or new facts as are made newly relevant by the court of appeals' decision—whether by the reasoning or by the result." *Wallace*, 573 F.3d at 88 n.5.

The problem with viewing the remand in this restricted sense is that a § 3353(a) analysis is a balancing analysis. For example, the statute directs the sentencing court to consider the "nature and circumstances of the offense" as well as the "history and characteristics of the defendant," measuring what the defendant did against who the defendant is. 18 U.S.C. §

---

[8] *North Carolina v. Pearce*, 395 U.S. 711 (1969), *overruled in part on other grounds*, *Alabama v. Smith*, 490 U.S. 794 (1989).

3553(a)(1).  If the Court were restricted to reconsidering § 3553(a) factors only to the extent they bore on Amendment 709, namely the impact of the Sentencing Commission's new policy on Mr. Ahrendt's criminal history, does the mandate rule in the First Circuit mean the Court could not measure the impact of the new criminal history policy against the seriousness of the offense?  In any event, to perform the § 3553(a) analysis, the Court would still have to measure its view of the impact of Amendment 709 against the other statutory factors to arrive at "a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in the statute. 18 U.S.C. § 3553(a).  In short, the advent of *Booker* and *Gall* and the obligation to sentence under § 3553(a) leaves the Court uncertain about the practical impact of the First Circuit's mandate rule.

There is a third possibility.  The First Circuit allows a sentencing court "some limited discretion to reopen the issue in very special situations."  *Wallace*, 573 F.3d at 88-89 (quoting *United States v. Bell*, 988 F.2d 247, 250 (1st Cir. 1993)).  There must be a showing of "exceptional circumstances" to avoid the "mandate rule," such as "a change in controlling legal authority, significant new evidence not earlier obtainable with due diligence, or the prospect of a serious injustice."  *Wallace*, 573 F.3d at 89.  There was no claim of a change in controlling legal authority.  However, there was a claim on resentencing that there was "significant new evidence not earlier obtainable with due diligence" and the "prospect of a serious injustice."

Mr. Ahrendt is a highly idiosyncratic person, who at the time of his sentencing and for a long time thereafter considered his prosecution, conviction, and sentencing to be a travesty of justice because it represented an oppressive action by the government against his right to take intoxicants.  At his resentencing, however, Mr. Ahrendt surprised the Court by announcing that he had revised his views and he was not going to take any intoxicants upon release from

incarceration.  Such an epiphany by most defendants facing resentencing would be skeptically viewed as opportunistic, a classic conviction conversion.  But the Court's perception of Mr. Ahrendt is that he has been painfully honest throughout the process, even when his honesty did not benefit him.  Mr. Ahrendt's change of heart could fit within the definition of new evidence since part of the Court's concern at the January 2006 sentencing was that Mr. Ahrendt was determined to recidivate and evidence of his change of philosophy was not available.  Similarly, the "serious injustice" element could be present based in part on Mr. Ahrendt's earlier self-representation, his history of mental illness, and his failure to make proper sentencing arguments.[9]

In the end, the Court ruled that the differences among these theories did not matter for Mr. Ahrendt's resentencing.  Whether the Court took a more expansive view of its obligation to resentence under § 3553(a), a more restrictive view under the First Circuit's mandate rule, or a broader view under the exceptional circumstances exception to the mandate rule, the critical question for resentencing was the likelihood of recidivism.  The Commission changes under Amendment 709 reflect a more lenient policy toward individuals with certain types of criminal histories, but the overall thrust of the criminal history calculation remains to determine the "seriousness of the defendant's criminal history [and] the likelihood that the defendant will commit further crimes."  U.S.S.C. § 4A1.3; *United States v. Brewer*, 127 F.3d 22, 25-26 (1st Cir. 1997).  However the remand order is viewed, the Court is authorized to consider "the likelihood

---

[9] Mr. Ahrendt's counsel contrasted Mr. Ahrendt's case to the circumstances in *United States v. Bell*, 988 F.2d 247 (1st Cir. 1993) in which the Court rejected the manifest injustice argument:

> The district court was not faced with an isolated instance of inadvertent oversight on the part of a beleaguered defendant.  Bell was represented by able counsel throughout.  He and his lawyer confirmed the district court's findings and conclusion time and again.  He passed up numerous opportunities for mounting the challenge he now wishes to press.

*Id*. at 251-52.

that the defendant will commit further crimes," a likelihood lessened with Mr. Ahrendt's philosophical volte-face.

### D.        Leadership Enhancement—U.S.S.G. § 3B1.1

The original PSR recommended that Mr. Ahrendt receive a two-level enhancement under U.S.S.G. § 3B1.1(c) for being a manager or organizer of a criminal activity that involved five or more participants or was otherwise extensive, and the Court has concluded that the question of whether to apply a two-level leadership enhancement is law of the case and not open for revision.  In dissent, Judge Merritt criticized the trial court for failing to adequately explain its conclusion.[10]  Even though the Court is bound by its earlier affirmed ruling, this does not prevent it from more thoroughly explaining why the enhancement was imposed.

Thus, prompted by Judge Merritt and in fairness to Mr. Ahrendt, the Court reviews the evidence and further explains its application of the leadership enhancement.  Under § 3B1.1, there are three levels of leadership enhancement.  A defendant may receive a 4 level enhancement if he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," a 3 level enhancement if he was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," and a 2 level enhancement if he was an "organizer, leader, manager, or supervisor in any criminal activity other than described in [the 4 or 3 enhancement levels]."  U.S.S.G. § 3B1.1(a)-(c).  The Commentary recommends the sentencing court consider the following factors:  "the exercise or decision making authority, the nature of

---

[10] Although he had standby counsel available, Mr. Ahrendt represented himself at the original sentencing.  The Court orally adopted the guideline findings recommended by the Probation Office, including the two-level § 3B1.1(c) enhancement.  When asked about objections to the PSR, Mr. Ahrendt said he objected to "[t]he whole thing."  The Court overruled his general objection but did not further explain its conclusions regarding each of the guideline calculations, since the PSR contained the facts underlying the application of the enhancement.  If Mr. Ahrendt had been more specific in his objection, the Court would have been more specific in its explanation.

participation in the commission of the offense, . . . the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.* cmt. 4.

At sentencing, the Court assigned a two-level enhancement to Mr. Ahrendt's activities, the lowest of the three possible levels. For an upward adjustment to apply under § 3B1.1(c), the evidence must show that the defendant "exercised control over, organized, or was otherwise responsible for superintending the activities of at least one other participant in a criminal activity on at least one occasion." *United States v. Ofray-Campos*, 534 F.3d 1, 40 (1st Cir. 2008) (internal punctuation and citation omitted). The Government bears the burden of proving by a preponderance of the evidence that a defendant qualifies for such an enhancement. *United States v. Medina*, 167 F.3d 77, 79 (1st Cir. 1999).

The evidence at trial established that the major players in this drug dealing conspiracy were Mr. Brimley and Mr. Deloatch. Mr. Brimley was Mr. Deloatch's boss; Mr. Deloatch was second in command. Mr. Davis, also a Boston drug dealer, came late to the conspiracy. It is also clear that the Boston drug dealers never fully trusted Mr. Ahrendt and he was not within their inner circle. Ms. Andrews, Mr. Brimley's Boston area girlfriend and the drug dealers' cover, said that Mr. Brimley, Mr. Deloatch, and Mr. Davis described Mr. Ahrendt as a "real naïve crackhead" and that they could "get him to do anything."

At the same time, Mr. Ahrendt was not a mere bystander. First, as Ms. Hurd testified, Mr. Ahrendt brought a "high clientele" to the Boston drug dealers. Lindsay Ennis, a trial witnesses who was a cocaine customer, testified that she was aware that as many as fifty people had obtained powder or crack cocaine at Mr. Ahrendt's house from Mr. Deloatch, Mr. Brimley, or Mr. Ahrendt. Amanda Clark, another trial witness and cocaine customer who was living at

Mr. Ahrendt's home, estimated that about twenty-five people bought cocaine from Mr. Ahrendt himself.

Second, Ms. Hurd confirmed that Mr. Ahrendt was financially involved with the Boston drug dealers. Ms. Hurd "fronted" Mr. Ahrendt; in other words, she gave him drugs in anticipation that he would sell them and return the money to her. When Ms. Hurd sought to collect money owed her by Mr. Ahrendt, he told her to take it up with Mr. Brimley.

Third, the Government established that Mr. Ahrendt was a frequent source of cocaine for the Bangor customers. Ms. Ennis testified that although she normally bought cocaine and cocaine base from Mr. Deloatch, she also bought these drugs directly from Mr. Ahrendt, perhaps as many as six or seven times. Ms. Clark testified that she got cocaine from either Mr. Deloatch or Mr. Ahrendt and they were equal as sources for cocaine.

Fourth, the Government established that Mr. Ahrendt did not merely sell cocaine, he also processed it. He measured and weighed it on digital scales that he kept either in the kitchen or in his bedroom, and he prepared or cooked the powder cocaine, altering it to crack cocaine. Ms. Ennis said that she occasionally bought powder cocaine and that Mr. Ahrendt cooked the powder into crack. Christina Bragan, another trial witness, and Ms. Clark also confirmed that Mr. Ahrendt cooked powder cocaine into crack. In fact, Ms. Clark stated that it was mostly Mr. Ahrendt who processed the powder cocaine into crack.

Fifth, Mr. Ahrendt was not merely allowing his Garland Street home to be used as a base of operations, he was charging for it. Ms. Clark testified that Mr. Deloatch would pay Mr. Ahrendt's bills or would buy food for him.

Sixth, some people who bought or got cocaine from Mr. Ahrendt resold it.  Ms. Ennis testified that she did so.  Ms. Clark testified that she, Ms. Mayhew, Ms. Bragan, Adam Rodriguez, and Mindy Eames were selling cocaine as well.

Seventh, Ms. Clark testified that Mr. Ahrendt kept a safe in his bedroom where he retained records for the amounts of cocaine he had transferred to other people and the amount of money they owed.

Eighth, Ms. Bragan testified that she would get cocaine from Mr. Ahrendt and distribute it to customers, and the customers would give the money to her to give to him.   Ms. Bragan also testified that she would occasionally call Mr. Brimley at Mr. Ahrendt's request "[i]f Will needed anything."  She was the one who called when Mr. Ahrendt was too busy.  Ms. Mayhew, another trial witness, testified that she received drugs from both Mr. Deloatch and Mr. Ahrendt and that she then distributed the drugs for them.

Ninth, Ms. Mayhew testified that in terms of drug distribution, Mr. Deloatch and Mr. Brimley distributed the most, Mr. Davis and Mr. Ahrendt were at the next level, and she was behind them all.

Tenth, on occasion, Mr. Ahrendt collected money from other local drug dealers on behalf of the Boston drug dealers.  For example, Ms. Mayhew testified that if Mr. Deloatch and Mr. Brimley were not at Garland Street and she had money to pay to them, she would give the money to Mr. Ahrendt to give to them.

This drug conspiracy, like most, did not follow the clean lines of a corporate organization chart.  However, it is clear from the evidence at trial that Mr. Ahrendt was more than an end-user of the cocaine the Boston drug dealers brought to Bangor.    He provided them a base of operations and a large customer list from his prior marijuana business.  He weighed and sold the

powder cocaine, and he cooked the powder into crack.  He was financially involved in their operation; they paid him for the use of his home and for food, and he collected money for them in their absence.  Mr. Ahrendt actively sold both powder and crack cocaine to Bangor customers, and some of his customers then resold the cocaine to others.  At least two witnesses, Ms. Mayhew and Ms. Bragan, testified that they sold Mr. Ahrendt's cocaine for him and returned the money to him after the sales.  This last fact places Mr. Ahrendt within *Ofray-Campos*'s requirement that for a § 3B1.1(c) enhancement, the defendant must have "exercised control over, organized, or was otherwise responsible for superintending the activities of at least one other participant in a criminal activity on at least one occasion."  *Ofray-Campos*, 534 F.3d at 40.

All told, the evidence, in the Court's view, required the conclusion that Mr. Ahrendt was an "organizer, leader, manager, or supervisor" within the meaning of § 3B1.1.  He was certainly not a leader within the meaning of § 3B1.1(a) or even § 3B1.1(b), but he fit well within the scope of § 3B1.1(c).  The Government met its burden to prove that he qualified for the enhancement by a preponderance of the evidence.

### E.   Disparity and the Right to Trial by Jury

In dissent, Judge Merritt criticized the five and one-half year and three and one-half year disparity between Mr. Ahrendt and the sentences that Mr. Deloatch and Mr. Brimley received. Again, this issue is not before the Court on remand.  *Ahrendt*, 504 F.3d at 95.   However, as Mr. Ahrendt has raised the question on remand and Judge Merritt raised it in dissent, it merits an explanation.

The differences between the three sentences are explainable first by differences among their advisory guideline calculations.  Both Mr. Deloatch and Mr. Brimley pleaded guilty and both received a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1;

Mr. Ahrendt did not.  He "put[] the government to its burden of proof at trial by denying the essential factual elements of guilt."  U.S.S.G. 3E1.1, cmt. 2; *United States v. Deppe*, 509 F.3d 54, 60 (1st Cir. 2007) (stating that "[w]hen a defendant proceeds to trial and puts the government to its proof, a credit for acceptance of responsibility normally will not be available").  Accordingly, Mr. Deloatch had a total offense level of 32, Mr. Brimley 33, and Mr. Ahrendt 34.

The second difference is criminal history.  Mr. Ahrendt had a criminal history category of IV, Mr. Brimley a criminal history category of III, and Mr. Deloatch had no prior convictions and a criminal history category of I.  With a criminal history category of IV and a total offense level of 34, Mr. Ahrendt's guideline range was 210 to 262.  The Court imposed a sentence on Mr. Ahrendt at the very bottom of the guideline range or 210 months.  With acceptance, Mr. Deloatch had a total offense level of 32 and with a criminal history category of I, his guideline range was 121 to 151.  The Court imposed a sentence of 144 months, toward the high end of the range in light of his greater culpability.  With acceptance, Mr. Brimley had a total offense level of 33 and with a criminal history category of III, his guideline range was 168 to 210.  The Court imposed a low end guideline sentence of 168 months.

Viewed another way, if Mr. Ahrendt had accepted responsibility and received a three-level § 3E1.1 reduction, his total offense level would have been 31 and his guideline range would have been 151 to 188 months.  Mr. Ahrendt's guideline range would have been higher than Mr. Deloatch's because Mr. Ahrendt had a criminal history whereas Mr. Deloatch had none, but Mr. Ahrendt's guideline range would have been lower than Mr. Brimley's despite Mr. Brimley's lower criminal history.

This leads to Judge Merritt's concern that the Court punished Mr. Ahrendt for asserting his right to a jury trial.  The Court is aware of the Sixth Amendment guarantee of the right to jury

trial and its significance in the panoply of fundamental rights within the Bill of Rights, and Judge Merritt's view that the Court may have punished a defendant for exercising his right to jury trial is extremely troubling.  This aspect of Judge Merritt's dissent, however, runs straight at one of the premises of the guidelines: an individual who accepts criminal responsibility and pleads guilty is entitled to a measure of leniency for truthfully admitting his criminal conduct and saving the government the expense and effort of a trial.  The necessary obverse of the application of § 3E1.1 is that the defendant who "puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse" is generally not entitled to a reduction.  U.S.S.G. § 3E1.1 cmt. 2.

Thus, in accordance with this guideline provision, the Court allowed a degree of leniency to Mr. Brimley and Mr. Deloatch because—unlike Mr. Ahrendt—they accepted responsibility for their crimes, admitted involvement, and saved the government the trouble and expense of trial.  The First Circuit has rejected the notion that, in according a lesser sentence to a defendant who admits his guilt, the guidelines are imposing an unconstitutional burden on those who exercise their right to a jury trial.  *United States v. Rosario-Peralta*, 199 F.3d 552, 570 (1st Cir. 1999); *United States v. Munoz*, 36 F.3d 1229, 1236-37 (1st Cir. 1994).

The Court is fully aware that the guideline sentence ranges are an advisory starting point. *Gall v. United States*, 552 U.S. 38 (2007).  In imposing a sentence under the factors set forth in 18 U.S.C. § 3553(a), the Court concluded that the sentencing ranges under the guidelines were appropriate for each Defendant, including Mr. Ahrendt.

### F.    Criminal History

Finally, the Court comes to the reason for the resentencing.  As the First Circuit noted, after Mr. Ahrendt was sentenced and while the case was on appeal, the United States Sentencing

Commission adopted Amendment 709. *Ahrendt*, 560 F.3d at 78-79. This amendment changed the way prior convictions are counted, and in Mr. Ahrendt's case, the result under the new provision would have dropped his criminal history category from Category IV to Category III.

### 1.    18 U.S.C. § 3553(a) Analysis

Although Mr. Ahrendt's guideline range remains 210 to 262 months, once the change in the guidelines is taken into account under 18 U.S.C. § 3553(a), the Court is aware that similarly situated defendants currently sentenced in federal courts face a lower guideline range of 188 to 235 months and that under § 3553(a)(6) the law requires that the Court "avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." It is also aware that Amendment 709 reflects a change in Commission policy. As described by the First Circuit in *Godin*, the Commission "made a substantive change . . . that goes even further in the direction of leniency," namely, that "it is better to start low, counting the same-day sentences as one, and adjust upward if warranted." *Godin*, 522 F.3d at 136.

The Court considered that in devising criminal history categories, the Sentencing Commission attempts to reflect the "seriousness of the defendant's criminal history [and] the likelihood that the defendant will commit further crimes." U.S.S.C. § 4A1.3; *Brewer*, 127 F.3d at 25-26. Here, regardless of the calculation of his criminal history, before his resentencing Mr. Ahrendt had repeatedly given every indication that he did not believe that the laws criminalizing the possession and distribution of illegal drugs were moral. However, as noted earlier, at his resentencing Mr. Ahrendt disavowed any intention to use intoxicants upon release from incarceration. Even so, the Court remained concerned about the need to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B) & (C).

The "nature and circumstances of the offense" were particularly troubling.  Before the involvement of the Boston cocaine dealers, Mr. Ahrendt's home in Bangor attracted teenagers who were rebelling against parental control and interested in smoking marijuana.  His view was that he was operating a "Dog Pound" and inviting all strays, but another view is that he offered a place for troubled teens to escape from parental authority and act up.   In any event, Mr. Ahrendt's home soon attracted a crowd of teenagers.

The introduction of powder and crack cocaine into his home was like the injection of a dangerous virus into the young people within the Bangor area.  During Mr. Ahrendt's trial, numerous young people testified about receiving cocaine at Mr. Ahrendt's home, and there was convincing evidence of risky behavior, the invariable fall-out from cocaine addiction.  During his Closing, Mr. Ahrendt seemed to recognize this when he said, "I realize my home did become overrun and abused, and again, that is my fault."

At the resentencing hearing, Mr. Ahrendt's stated change of philosophy generated a nearly uniform recommendation from the parties.  The prosecutor shared the Court's view that Mr. Ahrendt's change of mind was likely sincere and could justify a lower period of incarceration.  However, he suggested that to test his sincerity, a longer period of supervised release could be ordered to monitor his ongoing compliance.  He proposed extending the period of supervised release from the original period of four years to a non-guideline but statutory period of eight years.  The Defendant quickly agreed that extending the period of supervised release in exchange for a lower period of incarceration made sense.

Defense counsel argued for a sentence of 151 months, which equaled the lower end of a guideline range calculated under an Amendment 709 criminal history without the leadership enhancement.  Mr. Ahrendt himself urged the Court to reduce the sentence to ten years.  The

Government urged the Court to impose a sentence of 188 months, the low end of the guideline range under an Amendment 709 guideline.

The Court raised a concern about whether a sentence that imposed a higher term of supervised release upon remand would improperly punish the Defendant for taking a successful appeal. *Pearce*, 395 U.S. at 726 (stating that if a defendant receives a higher sentence after successful appeal, the reasons must "be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding"); *Johnson v. Vose*, 927 F.2d 10, 11 (1st Cir. 1991) (same). Counsel agreed that so long as the new sentence did not in total exceed the old one, the Court could impose a longer period of supervised release.[11] The solution seemed apparent. The Court increased the period of Mr. Ahrendt's supervised release by four years and decreased his period of incarceration by an equal amount. The resulting sentence was 162 months of incarceration plus 8 years of supervised release.

This final sentence was not simply a mathematical calculation. It also met the Court's view of the correct sentence to impose on Mr. Ahrendt under 18 U.S.C. § 3553(a). Mr. Ahrendt ended up with a lower sentence than the ringleader, Mr. Brimley, and a slightly longer one than Mr. Deloatch, who despite his culpability had no criminal history. The lower sentence substantially mitigated Judge Merritt's concerns about the disparity of sentences among co-defendants and about Mr. Ahrendt's right to a jury trial. At the same time, the Court remained convinced that the seriousness of his conduct and its impact on the community merited a stern punishment.

---

[11] The *Pearce* presumption of vindictiveness, later clarified in *Blackledge v. Perry*, 417 U.S. 21, 27 (1974), comes into play only where "a realistic likelihood of 'vindictiveness'" exists. Here, Mr. Ahrendt did not receive a harsher sentence on resentencing.

In the end, balancing the factors set forth in 18 U.S.C. § 3553(a), the Court concluded that 162 months is a sentence "sufficient but not greater than necessary" to achieve the purposes of the law.

## III.   CONCLUSION

William Ahrendt's total offense level was 34; he fell within criminal history category IV under the version of the guidelines applicable to his sentencing; and his guideline sentence range continued to be 210 to 262 months.  However, the Court—as directed by the First Circuit—"considered the Sentencing Commission's updated views," *Ahrendt*, 560 F.3d at 80, and the fact that under the current version of the guidelines, Mr. Ahrendt's guideline sentence range would be 188 to 235 months.  The Court amended its sentence and, having evaluated and applied the factors in 18 U.S.C. § 3553(a), imposed a sentence of 162 months incarceration to be followed by eight years of supervised release.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 17th day of May, 2010